Overall v. City of Madisonville.

CASE 78.—ACTION BY R. W. OVERALL, A TAXPAYER, AGAINST THE CITY OF MADISONVILLE TO ENJOIN THE EXECUTION OF A CONTRACT FOR AN ELECTRIC LIGHT PLANT.—May 15.

# Overall v. City of Madisonville

Appeal from Hopkins Circuit Court.

J. F. GORDON, Circuit Judge.

Judgment for defendant. Plaintiff appeals. Affirmed.

1. Municipal Corporations—Lighting Plants—Right to Install—Cities of Fourth Class—Ky. Stats. 1903, section 3490, subsec. 10, authorizes any city of the fourth class to provide for the li-hting of streets, etc. Section 3580 (Act March 24, 1894) authorizes them to establish boards of public works, and provides, where no such board is established, its duties shall be performed by the council, etc. Other sections give such board control of the lighting of public places and of such works as the city may own for supplying the city or the inhabitants thereof with light, etc., and exclusive power to build etc., any such works. Held, that such cities may install light plants to furnish public lighting, and incidentally light to their inhabitants; the foregoing provisions being either an express grant of such power or a legislative construction of the extent of the powers conferred by section 3490, subsec. 33, providing that city councils of such cities may pass ordinances to carry into effect all the powers granted for the government of the cities and to do all things properly belonging to the police of incorporated cities.

2. Same—General Fund—Availability—Funds in a city treasury accumulated from license taxes, fines, etc., may be applied to any governmental purpose, being available for any purpose for which taxes might have been levied.

3. Same—Indebtedness—Limit—How Determined—Under Const., section 157, prohibiting cities from becoming indebted, without the assent of two-thirds of their voters, to an amount

Overall v. City of Madisonville.

exceeding in any one year the income and revenue provided for such year, such income and revenue includes collectible delinquent taxes of previous years, and includes not only the levy actually made for any year, but such as could have been legally made.

4. Same—Future Fines and License Taxes—Moneys to be derived by a city during an ensuing year from fines and license fees are too uncertain and indefinite to be estimated in determining the amount of debt that may be incurred, under Const., section 157, prohibiting cities from incurring debt to an amount exceeding in any one year the income and revenue provided for such year.

5. Same—Meaning of "Indebtedness."—Under Const. section 157, prohibiting cities from incurring indebtedness, without the voters' assent, in any one year exceeding the amount of income and revenue provided for that year, "indebtedness" means a liability voluntarily incurred by the city by express contract, which it is bound to pay in money, including known and fixed liabilities, such as official salaries, etc.

6. Same—Public Utility—Purchase in Piecemeal—In installing a lighting plant, a city of the fourth class is left wholly to the judgment of its council as to the kind, the cost, when and where it will buy, and how much at a time.

7. Same—Discretion as to Making of Improvement—A city council is to judge what public improvements are most needed, and hence a city cannot be enjoined from devoting its general funds to installing a lighting plant, though it neglects its streets and other governmental duties.

8. Same—A lease by a city for one year of premises to be used in installing a lighting plant, with an option to the city to continue it from year to year, or to buy at a fixed price is not repugnant to Const., section 157, prohibiting cities from incurring a liability beyond the revenues of the year.

9. Landlord and Tenant—Renewal or Purchase—Option—Consideration—A lease for one year at a fixed rental of premises to a city to be used installing a lighting plant is sufficient consideration to support an option to the city to continue from year to year, or to buy at a fixed price.

10. Municipal Corporations—Councilmen—Vacancy—De Facto Officers—Where, in a city entitled to six councilmen, there were three vacancies, and the three remaining filled one vacancy, and the four filled the other vacancies, the appointees having qualified and acted were at least de facto officers, whose acts were binding upon the public, if they were not properly appointed.

Overall v. City of Madisonville.

YOST & LAFFOON, GORDON, GORDON & COX, and WAD-DELL & DEMPSEY Attys. for appellant.

POINTS AND AUTHORITIES.

1.   The record shows a plain violation of sec. 157 Constitution and of various sections of fourth class charters.   Defendants cannot do   indirectly what   they are forbidden   to do   directly. Every step of defendants is either a direct violation of positive law or a palpable evasion thereof.   (Constitution of Kentucky, sec. 157; Kentucky Stat., sec. 3490; subsecs. 26, 34; Field v. Stroube, 19 Ky. Law Rep., p. 1751; Beard v. City of Hopkinsville, 95 Ky., p 239; Knipper v. City of Covington, 22 Ky. Law Rep., p. 676; Earles v. Wells, 59 Am. St. Rep., p. 886; Laporte v. Gamewell, etc., Co., 58 Am. St. Rep., p 359; Windsor v. Des Moines, 80 Am. St. Rep., p. 280; Rice v. Milwaukee, 100 Wis., p. 516; Prince v. Quincy, 44 Am. Rep., p. 785; Sackett v. New Albany, 45 Am. Rep., p. 467; Eddy Valve Co. v. Crown Point, 3 L. R. A. (N. S.), p. 684 and note; Voss v. Water Co., 66 L. R. A., p. 95; Ottumwa v. Water Co., 59 L. R. A., p. 604 and note.)

2.   Less than a quorum of the city council has assumed all the powers of the council.   Their acts are void.   There was no de facto council.   Even if a de facto council, its acts must be in good faith to be binding.   (City of Somerset v. Somerset Banking Co., 22 Ky. Law Rep., p. 1129.)

3.   We believe that a careful consideration of this record will result in certain reversal.

JONSON & JENNINGS Attys. for appellee.

POINTS ARGUED AND AUTHORITIES CITED.

1. . Did Sory vacate his office?   (Pate v. Comth., 22 Ky. Law Rep., 1890, 61 S. W., 1009; Creighton v. Comth., 83 Ky., 142; Rodman v. Harcourt 4 B. M., 224; Gilbert v. Huston Lit. Sel. Cas., 223; Hoaglan v. Carpenter 4 Bush, 89; Morgan v. Vance Ib., 323; City Bardstown v. Nelson Co., 25 Ky Law Rep., 1478; 78 S. W., 169; Ky. Stat. sec. 3746, 3444, 3484, 3486; Keating v. City Cov., 18 Ky. Law Rep., 245; 35 S. W., 1026; Acts 1904 Ch., 35 p. 106; McCreary on Elections, sec 340; Meachem on Pub. Off. sec. 420; Bishop v. State, 63 Am. St. Rep., 279; Oliver v. Jersey City 76 Id., 228; Hoaglan v. Carpenter supra; Richardson v. Justices, 2 Ky., 174; Taylor v. Comth., 3 J. J.M., 407; Goodloe v. Fox, 96

Overall v. City of Madisonville.

Ky., 607; Rice v. Somth., 3 Bush, 17; Wilson v. King, 3 Litt., 459.)

2. Was there a quorum of the council on September 3? (Ky. Stats., secs. 3486, 3552; Gilbert v. Huston, Litt. Sel. Cas., 225.)

3. Bone and Lamb were at least de facto officers and their acts binding on the public and third parties. (Smith v. Cansler, 83 Ky., 372; Rice v. Comth., 3 Bush, 14; Carroll v. State, 9 Am. Rep., 416; Meachem on Pub. Off. sec. 317, 318; 8 Am. & Eng. Enc. of Law, 2nd ed., 795, 790, 823; Pence v. City of Frankfort, 19 Ky. Law Rep., 721, 41 S. W., 1011; Justices v. Clark, 1 Mon., 82; Butler v. Walker, 39 Am. St. Rep., 61, 64 Id., 585.)

4. Lighting the city is a public purpose and the city may erect a plant and furnish light to its inhabitants. (Ky. Stat., sec. 3490, 10, 3580, 3583; Abbott Mun. Corp., pp. 302, 399; Jacksonville Elec. Lt. Co. v. Jacksonville, 51 Am. St. Rep., 24; City Crawfordsville v. Braden, 30 Id., 214; City Newport v. Newport Lt. Co., 84 Ky., 166; Bd. Coun. Frankfort v. Comth, 94 S. W., 648, 29 Ky Law Rep, 699; Smith Mun. Corp., sec. 831; Lake Co. v. Walsh, 98 Am. St. Rep., 272; Fawcett v. Mt. Airy, 101 Id., 825; Sumner v. City, 97 Id., 396; Mitchell v. Negaunee 67 Id., 468; Winsor v. Des Moines, 80 Id., 294; Liner v. Burgesses, 25 L. R. A., 217; Henderson v. Young, 83 S. W., 583; 26 Ky. Law Rep., 1152.)

5. What constitutes the revenue and income of a city? City Prov. v. Prov. Lt. Co., 91 S. W., 664; 28 Ky. Law Rep., 1015; Lamar Water Co. v. Lamar, 26 S. W., 1025; 31 S. W., 756; 32 L. R. A., 157; Field v. Stroube, 44 S. W., 363; 19 Ky. Law Rep., 1751; Wathen v. Young, 44 S. W., 115; 19 Ky. Law Rep., 1678; Whaley v. Comth., 61 S. W., 35; 23 Ky. Law Rep., 1292; Webster's International Dictionary.)

6. What constitutes "Indebtedness" in the meaning of the constitution? "O'Bryan v. Owensboro, 63 S. W., 858; 24 Ky. Law Rep., 469; Hopkins Co. v. St. Ber. Min. Co., 70 S. W., 289; 24 Ky. Law Rep., 942; Lewis v. Widbur, 99 Cal., 412; 23 L. R. A., 40, notes; Roach v. Chapman, 58 Am. St. Rep., 59; Abbott Mun. Corp., sec. 157; City of Congers v. Kirk, 78 Ga., 480; City of East St. Louis v. Flannagan, 26 Ill. App., 499; City of South Bend v. Reynolds, 49 L. R. A., 495; State ex. Rel. v. Helena 55 Id.,——, brief; Grant v. Davenport, 36 Iowa, 396; 1 Dillon Mun. Corp., 4th ed., sec. 136a; Wade v. Oakman, 165 Pa., 479; Walla Walla Wat. Co. v. Walla Walla, 60 Fed., 957; Toland v. Franklin, 142 Ind., 546; Lamar Water Co. v. Lamar, 32 L. R. A., 157; Tenting ex rel. v. Okla., 20 Okla., 158; People v. Pachico, 27 Cal., 176; People ex rel. v. May, 9 Colo., 404; Smith v. Dedham, 144 Mass., 177; Fenton v. Blair, 11 Utah, 78; Andrews Co. v. Schell, 135 Mo., 31, 36 S. W., 206.)

7.  Can the revenue and income for 1906 be appropriated for the light plant.  (Field v. Stroube, 44 S. W., 363; 19 Ky. Law Rep., 1751; Wathen v. Young, 44 S. W., 115; 19 Ky. Law Rep., 1678; Whaley v. Comth., 61 S. W., 35; 23 Ky. Law Rep., 1292; Abbott Mun. Corp., 1027; Hunt v. City N. Y., 62 N. Y., 184; Burch v. City Owensboro, 36 S. W., 12; 18 Ky. Law Rep., 284; Pulaski Co. v. Watson, 50 S. W., 861; 21 Ky. Law Rep., 61; Town Mt. Pleasant v. Eversole, 96 S. W., 478; 29 Ky. Law Rep., 831.)

8.  Taxes to be levied can be anticipated.  (Abbott Mun. Corp., sec. 384; Trustees Dist., 32 v. Kane, &c., 87 S. W., 321; 27 Ky. Law Rep., 983; Addyston v. Corry, 80 Am. St. Rep., 814; Earles v. Wells, 59 Ib., 891.)

9.  The city can build its plant piecemeal.

10.  Does the financial condition of the city at the time of making the contracts or at the trial of suit control and did the city exceed its revenue.

11.  The lower court did not err in striking from plaintiff's pleadings or in refusing to permit the filing of the amended and supplemental petition.

OPINION OF THE COURT BY CHIEF JUSTICE O'REAR—Affirming.

Madisonville is a city of the fourth class.  Being out of debt, its city council desired to install a municipal lighting plant, to light the streets and public places of the city, as well as to furnish electric lights to its inhabitants.  The plant was to cost about $27,-000, exclusive of lot and building.  The revenues and income of the city were alleged to be less than $27,000 a year.  The council advertised for bids for machinery, poles, wires, and work necessary to erect and install the plant.  Bids were submitted separately for poles, and for machinery set up and connected, for wires put up for incandescent lighting, and for wires put up and connected for arc lighting.  The bids were accepted—that is, they were approved as the lowest and best bids—but the contracts were not then let, but were later completed at different times, running through the year.  This suit is by a taxpayer to enjoin

the execution of the contracts upon the ground that they are void as being in contravention of the constitutional prohibition against the city's becoming indebted in any year in excess of its revenues for that year. The circuit court refused the injunction, and dismissed the petition. Hence this appeal.

The principal questions for decision are: (1) Has a city of the fourth class the power to install and own its own lighting plant, to be operated both to light the public places of the city, and to furnish lights to its inhabitants as a commercial enterprise? (2) What constitutes the "revenues and income" of the city for a year. And (3) What is an "indebtedness," in the meaning of section 157 of the Constitution? There are other and minor questions presented which will also be noticed.

Section 157 of the Constitution, in part, provides: "No county, city, town, taxing district, or other municipalty shall be authorized or permitted to become indebted, in any manner or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose; and any indebtedness contracted in violation of this section shall be void. Nor shall such contract be enforceable by the person with whom made; nor shall such municipality ever be authorized to assume the same." Public ownership of public utilities has been a political as well as a legal question for quite a while. It seems to have been a political question long before its legality was doubted. We read that Hezekiah, king of Judea, established and maintained by public authority a city waterworks plant in the city of David. 2 Kings, c. 20, verse 20. And who has not heard of

the famous public baths of ancient Rome? The public
lighting of the streets of cities is of modern origin.
Yet the necessity for lights in a city is scarcely less
now than its necessity for water. Indeed, private
wells and cisterns, and resort to natural streams by
individuals for their necessary water, could as easily
dispense with public waterworks, and more justly per-
haps, than could private property owners light the
adjacent streets and public places. It is found that
light is not only essential to the safety of travelers to
prevent their coming in contact with obstructions, but
they perform a most valuable office in preventing
crime. It is known that crime thrives best in dark-
ness. A good light is the equivalent of a good police-
man in preventing certain forms of crime. It is
therefore universally held now that it is clearly with-
in the police power of cities, even without express
authority, to provide public lighting of their streets
at the publc expense. Crawfordsville v. Braden, 130
Ind. 149, 28 N. E. 849, 14 L. R. A. 268, 30 Am. St.
Rep. 214; Mauldin v. City of Greenville, 33 S. C. 1,
11 S. E. 434, 8 L. R. A. 291; Ellinwood v. Reedsburg,
91 Wis. 131, 64 N. W. 885; Heilbron v. Cuthbert, 96
Ga. 312, 23 S. E. 206. Where a city is given the power,
either expressly or by necessary implication as an
incident to its police power, to light its streets, and
where the precise method is not expressly provided,
·it may either hire another to furnish the lights, or may
furnish its own lights. The power to do the thing
unreservedly gives the city the discretion in the choice
of means it will adopt. Mauldin v. City of Greenville,
33 S. C. 1, 11 S. E. 434, 8 L. R. A. 291; Smith's Mun.
Corp. sec. 881; Henderson v. Young, 119 Ky. 224, 83
S. W. 583, 26 Ky. Law Rep. 1152; Jacksonville Elec-
tric Light Co. v. Jacksonville, 36 Fla. 229, 18 South,

677, 30 L. R. A. 540, 51 Am. St. Rep. 24; Smith v.
City of Nashville, 88 Tenn. 464, 12 S. W. 924, 7 L. R.
A. 469; Bridgeport v. Housatonic R. R. Co., 15 Conn.
475; Crawfordsville v. Braden, 130 Ind. 149, 28 N. E.
849, 14 L. R. A, 268, 30 Am. St. Rep. 214.

Cities of the fourth class of this State are granted
power (section 3490, subsec. 10, Ky. Stats., 1903, Car-
roll's Ed.): "To provide for the lighting of the
streets, market houses and other public buildings,
rooms and offices, with gas, or in any other manner."
By an act approved March 24, 1894, which is an amend-
ment to their charters (section 3580, Ky. Stats., 1903,
Carroll's Ed.), cities of the fourth class are permitted
to establish boards of public works. The section,
however, concludes: "Where no board of public
works has been established, the duties herein im-
posed shall be performed by the council and such
other employes and agents as said council may elect
or designate." By other sections of the act the
authorities and powers of the board are declared.
It is given especial control of the construction,
repairing, and cleaning of streets, "and the lighting
of all such public places as may be deemed necessary
within the corporation." It is also given "exclusive
control over such works as the city may own for sup-
plying the city or the inhabitants thereof with water,
light, heat or power, and shall have exclusive power
to build, construct, equip, control, manage and
operate any works the city may hereafter determine
to own or construct for supplying the city or the
inhabitants thereof with water, light, heat or power."
These provisions are either an express grant of
power to the cities (and we incline strongly to that
view), or are a legislative construction of the extent
of the powers already conferred in the general wel-

fare clause (section 3490, subsec. 33, Ky. Stat., 1903),
and in subsection 10, of section 3490, Ky. Stat., 1903,
supra, the authority is here expressly conferred upon
the council to contract for, and to construct and
operate, a lighting plant to light the public streets
and places, and to furnish lights to the inhabitants
of the city. Whether a municipal corporation, an
arm, as it were, of the state government, set up for
governmental purposes only, ought to be privileged
to engage in a purely commercial business, is a ques-
tion of politics as well as, perhaps, of constitutional
power. It involves the requiring of every citizen,
who is a taxpayer, to contribute to the enterprise, to
become a member of it in a sense, whether he wills
to or not. Whether it is a governmental function to
embark the public revenues in a commercial enter-
prise in order to cheapen a commodity of very com-
mon use, or which is even a necessity, may be a dis-
putable question; but there is no doubt that the
lighting of the public streets and places is a purely
governmental matter. If the municipality may build
and operate its own light plant for that purpose,
and it may, it ought to be permitted to sell the sur-
plus of its product as it would be to sell any of the
horses bought for its fire department when they were
no longer needed in the public service, or to sell any-
thing else it rightfully had, but had no further use
for. So it is now held that they may sell such sur-
plus property or products. City of Henderson v.
Young, 119 Ky. 224, 83 S. W., 583; 26 Ky. Law Rep.,
1152; Rogers v. City of Wickliffe, 94 S. W., 24, 29
Ky. Law Rep., 587; Pike's Peak Power Co. v. City
of Colorado Springs, 105 Fed., 1, 44 C. C. A., 333.
It is true the courts generally rest their decisions as
to the power of the municipality to produce and sell

lights to its citizens as well as to furnish its own, upon the theory of the dual nature of a municipal government, in which it is part public and part private. This distinction, though, is rapidly disappearing, and exists now perhaps more as a fiction of the law than as a fact. Towns are now organized for governmental purposes only, no longer for the enjoyment of exceptional privileges granted as a favor by the sovereign. They levy taxes for governmental purposes, and can levy them for none other. Hence any expenditure of the public money must be in furtherance of a public benefit in its nature governmental. In this state a great many towns and cities own and operate their own light and water plants. In nearly every instance they furnish light and water to the inhabitants as well as to the public places. In no instance of which we are aware has it been held by any court, or allowed by an act of Legislature, that a municipality could go into a commercial business purely as an enterprise of gain. It is always allowed or supported by the reason that it has the right to make or store the product for its public use. Common sense and good business allow that it should sell its surplus to its inhabitants, rather than to waste it. In this way it is enabled, too, to accomplish the main purpose, the public purpose, by enabling it to own and to economically operate a plant for that purpose. A city doubtless, would not be allowed to act as a bond broker. Nevertheless, it may invest its sinking fund, which it is allowed and required to have in certain contingencies, in commercial bonds, and necessarily to sell them. Its prisoners may be required to work in its workhouse. May not the product of their labor be sold? The situations all seem to us to be analagous. The

main feature in each is a clearly governmental power
and duty. The other or added feature is incidental,
and allowed as a sensible and necessary concomitant
of the main purpose. We think the city had the
power to install a light plant to furnish public light-
ing, and incidentally, as is proposed, light to its
inhabitants.

The city of Madisonville, at the beginning of the
year 1906, was not only out of debt, but had $8,000
in cash on hand. The assessed value of property for
taxation was about $1,500,000. Under the Constitu-
tion, the city was authorized to levy a tax of 75 cents
on the $100 of taxable property. Thus its revenues
from the source of property tax alone was $11,250.
It had about 900 poles from which $1,350 could have
been realized. The only legal liability which the city
incurred in May of 1906, on account of the electric
light plant, was for the poles, $1,200. The contract
for the machinery, amounting to $9,892, was not
closed until July of 1906. In the meantime the city
had collected of delinquent taxes from former years,
and in license taxes, fines, and from miscellaneous
sources, a sum largely in excess of the above-named
liability of about $11,000, created on account of the
light plant. And in September, 1906, when the city
closed the contract for the incandescent wire system,
and for building machinery foundation, amounting
to some $7,928, it had collected from the sources
above named, including ad valorem taxes, poll taxes,
and cash on hand at the beginning of the year, about
$600 more than the total of the light plant liability
so far contracted, and over and above all its ordinary
running expenses. By January 1, 1907, it had paid
out of the income and revenues of 1906 all its current
expenses and all the cost so far incurred in building

the plant, and had considerable money left in the treasury. With this, and by anticipating the revenues of 1907, it in January, 1907, contracted for the remainder of the line (about $7,500) known as the "Arc Line." In this way the city has contracted no debt beyond its current revenues. It agreed to pay cash, and has paid cash for all it bought. It accomplished this by not buying more than it had the means on hand, or certainly then due it, to pay for. The city had the right to apply the $8,000 on hand January 1, 1906, to any governmental purpose. It appears to have been a general accumulation in the city treasury—doubtless from license taxes, fines, and the like. This surplus was available for any proper purpose for which taxes might have been levied. Field v. Stroube, 103 Ky., 114, 19 Ky. Law Rep., 1751, 44 S. W., 363; Wathen v. Young, 103 Ky., 36, 19 Ky. Law Rep., 1678, 44 S. W., 115; Whaley v. Commonwealth, 110 Ky., 154, 61 S. W., 35, 23 Ky. Law Rep., 1292. The "income and revenues" of the city for the year 1906, included delinquent taxes of previous years which were collectible. Graham v. Spokane, 19 Wash. 477, 53 Pac., 714; French v. Burlington, 42 Iowa, 614. There were also included, not only the levy that was actually made for 1906, but such as could have been legally made, for the purpose of testing the binding obligation of the city's contracts incurred during the year. City of Providence v. Providence Light Co., 122 Ky., 237, 91 S. W. 664, 28 Ky. Law Rep., 1015.

It may be conceded, for the purpose of this decision, that fines and license fees were too uncertain and indefinite to be estimated in the beginning of the year, as part of the income of that year. If they were so treated, we easily see how a city might inadvertently,

or by clever design, exceed the constitutional limit by overestimating these sources of revenue, though based upon the experience of previous years. For, unlike taxes, their collection depends upon whether the licensees elect to take out the licenses, and whether the fines are assessed and paid. The result would be a debt without wherewith to pay it, and without the consent of the requisite voting tax payers. Such items in futuro have been held not properly estimable. Rice v. Milwaukee, 100 Wis., 516, 76 N. W., 341. But, where the licenses are paid, and the fines assessed and collected, the uncertainty which was the sole obstacle to carrying them into the estimate of the city's income for the year has been eliminated. They are then as available as any other cash on hand for the purpose of buying machinery for a light plant, and may be so applied by the city. If the contract was made before the license fees and fines were collected, its validity might ultimately depend upon whether they are in fact collected. But all these doubts are removed by their collection before the liability was incurred. It is scarcely necessary to here enter upon a discussion of what an indebtedness is, under section 157 of the Constitution. It is enough to say that it is a liability voluntarily incurred by the city by express contract, and which it is bound to pay in money. Still, in estimating a city's liabilities as compared with its cash and income, it is proper to consider, in addition, those known and fixed liabilities, such as official salaries and the like, as the government must be maintained. Troutman v. Hays (decided May 3, 1907), 101 S. W., 976, 30 Ky. Law Rep., 204.

Appellant contends that the city could not legally contract for a light plant in piecemeal. The

reason assigned is that no part of it is valuable as a public utility till all of it is assembled. The reason is not satisfying. If the plant was not run after it was bought, it would equally fail to meet the public requirement. Yet that fact ought not to avoid an otherwise perfectly valid contract for its construction. In the matter of buying and installing such plant, the city is left wholly to the judgment of its council as to the kind, the cost, when and where it shall buy, and how much at a time. There is only one limitation upon the city; that is, it shall not become indebted beyond the income and revenues of the year without the assent of two-thirds of the voters voting on the question. The Constitution did not design an interference with a free exercise of a city's judgment as to its expenditures for public purposes, provided it had the means at hand to pay for them. It did not discourage cash payments, but rather encouraged them. The course of appellee city in buying only what it could pay for, and as it could pay for it, is one that might be more frequently followed with satisfactory results to taxpayers.

Another complaint is that the city, in order to buy its light plant, neglected to repair its streets, and neglected other governmental duties. There is no evidence in the record to this effect; but, if the charge were sustained, we do not see how that could vitiate its contracts with those who sold it the machinery and other equipment for the light plant. After all, the city council is to judge what public improvements are most needed by the city, and, if all that it needs cannot be got at once, to select that which is the most urgent. If any discretion is to be left in the city council, it is as to such matters. Whether it has criminally neglected its streets, so as to render the city or

the members of its council liable to a penal prosecution therefor, is not shown, and, if it was, has no place in this litigation.

A still further objection is that the city does not own the lot or building in which the machinery is placed. The record does not show the arrangement between the city and the lot owner,, whether it is by lease with option to buy, or how that is. A lease for one year, with an option to the city to continue it from year to year, or to buy it at a fixed price, would not be repugnant to the Constitution as incurring a liability beyond the revenues of the year. The lease at $400 (which is the sum intimated in the record as being the rental) would not, when added to the other items examined and discussed, exceed the city's revenues for the year. Such a lease would be sufficient consideration to support the options named; but the city would not be bound on the options until it accepted them. As there is nothing showing that the city has violated the Constitution by incurring a debt beyond the constitutional limitations, we cannot control the discretion of the council in bargaining for its lot, and making such terms therefor as suit it, and as are not unlawful.

The city has six councilmen. One had vacated his office, and two resigned. Thus, there were three vacancies. The three remaining councilmen filled one of the vacancies by their appointment. The four sitting as a city council filled the other by their appointment. The statutes provide for the filling of vacancies in the office of councilmen of cities of the fourth class by appointment by the council. Section 3552, Ky. Stats., 1903. A majority of the members constitute a quorum, with power to act. Section 3486, Id. We are not now prepared to say whether this method

was the proper one for filling the vacancies under the circumstances. Nor do we find it necessary to decide the question. The appointees qualified and acted, and were de facto officers, whose acts, in any event, are binding upon the public.

Perceiving no error in the record, the judgment is affirmed.