# IN THE MATTER OF THE ESTATE OF BATHSHEBA M. ALLEN, DECEASED.

## No. 2367.

ARGUED OCTOBER 27, 1939, AND
SUBMITTED NOVEMBER 9, 1939. DECIDED JULY 12, 1940.

COKE, C. J., PETERS, J., AND CIRCUIT JUDGE BUCK
IN PLACE OF KEMP, J., DISQUALIFIED.

502

OPINION OF THE COURT BY COKE, C. J.

Samuel Clesson Allen, a resident of Honolulu, died May 13, 1903. His widow, Bathsheba M. Allen, died February 11, 1914. Each left an estate of large value which was disposed of by their respective last wills. In his will Mr. Allen, after making certain specific bequests, devised and bequeathed the residue of his estate to a board of trustees, one of which was Mrs. Allen, and who was named as life beneficiary. Mr. Allen also gave to his wife the power of appointment of his estate by a provision in his will reading as follows: "I give devise and bequeath all the rest residue and remainder of my property of every description nature and kind real personal and mixed (which and the investments for the time being representing the same are hereinafter called 'my Trust estate') to my wife the said Bathsheba M. Allen and the said Mark P. Robinson Joseph O. Carter and Paul Muhlendorf and to their successors in the trust (hereinafter called 'my Trustees') upon trust that my said wife Bathsheba M. Allen shall have the use benefit and enjoyment and income thereof for and during the term of her natural life and on the death of my said wife my Trustees shall hold my trust estate provided my said wife shall have survived me Upon Trust for such person or persons in such shares or proportions and otherwise in all respects as my said wife Bathsheba M. Allen shall by her last will and testament or any codicil thereto appoint," etc. Mrs. Allen, by her last will and codicils thereto, exercised the power of appointment delegated to her in the will of her deceased husband. After providing numerous special bequests and devises, Mrs. Allen disposed of all the residue of her estate, together with such property as was then subject to the power of appointment of the board of trustees, to hold and administer the same pursuant to the provisions of her will.

504

Paragraphs 48 and 49 of Mrs. Allen's will read as follows: "FORTY-EIGHTH: I give, devise and bequeath all the rest, residue and remainder of my property of every description, nature and kind and wheresoever situate, hereinafter called my 'Trust Estate', unto Mark P. Robinson, Paul Muhlendorf and James E. Jaeger, and their successors in trust, hereinafter called my 'Trustees', upon trust, that my brother Mark P. Robinson and my sisters, Mary E. Foster, Victoria Ward, Matilda Foster, A. (Watty) Jaeger and Lucy McWayne, shall have the use, benefit, enjoyment and income thereof for and during the term of their natural lives, and the survivors and survivor of them, for her, his or their natural life, or lives (equally while more than one); provided, however, that if my brother or any of my sisters shall die at any time leaving a child or children surviving him or her then in every such case and until the death of the last survivor of my brother and sisters such child or children (in equal shares while there shall be more than one) shall have the use, benefit, enjoyment and income of and from my said Trust Estate, which his or her or their parent would have taken if living, and on the death of the last survivor of my said brother and sisters I give, devise and bequeath all the rest, residue and remainder of my property of every description, nature and kind and wheresoever situate, and free and clear of the terms and provisions of this trust absolutely and unconditionally, vesting without conveyance or other act or writing from or by my said Trustees, to all of the children then living of my said brother, Mark P. Robinson, and my said sisters, Mary E. Foster, Victoria Ward, Matilda Foster, A. (Watty) Jaeger and Lucy McWayne, said children taking per stirpes, the children if more than one of my brother or any sister taking in equal shares among themselves, and to the children then living of any child then deceased

of my brother or sisters taking per stirpes by right of representation; so that the children of my brother and sisters who shall be the object of this trust shall take in equal shares per stirpes and not per capita and the children being objects of this trust of any child of my brother or sisters having died in the lifetime of my brother and sisters or the survivor of them shall take equally between them the share which the parent would have taken had he or she survived the last survivor of my brother and sisters aforesaid. FORTY-NINTH: And whereas by the last Will and Testament of my late husband, Samuel Clesson Allen aforesaid, dated the 5th day of September A. D. 1900, which said Will upon the decease of my said husband was duly admitted to probate in the Circuit Court of the First Judicial Circuit, Territory of Hawaii, on the 6th day of July, A. D. 1903, my said husband after making certain specific devises and bequests, devised and bequeathed all the rest, residue and remainder of his property of every description, nature and kind, real, personal and mixed, to me, the said Bathsheba M. Allen and to Mark P. Robinson, Joseph O. Carter and Paul Muhlendorf, and to my and their successors in trust, upon trust that I, the said Bathsheba M. Allen, should have the use, benefit, enjoyment and income of said residuary estate for and during the term of my natural life, and also provided that upon my death the trustees aforesaid under the Will of my late husband aforesaid should hold the trust estate created thereunder provided I survived him, upon trust for such person or persons in such shares or proportion and otherwise in all respects as I, the said Bathsheba M. Allen, should by my last Will and Testament or any Codicil thereto, appoint, and in default of such appointment and so far as any such appointment should not extend or if I, the said Bathsheba M. Allen, should not survive him, upon certain trusts in said Will more specif-

ically set forth; And whereas by the death of my said husband and the probate of his said Will and by reason of having survived him, I now have the authority to exercise the power of appointment conferred upon me under the Will of my husband as aforesaid, and desiring so to do; NOW, THEREFORE, in the exercise of the powers and authority granted to me by my said husband under his said Will hereinabove recited and by virtue of every other power me hereunto enabling, I hereby appoint that upon my decease the trustees for the time being under the Will of my said husband shall hold the entire trust estate created under the Will of my said husband and then remaining, upon trust that my brother, Mark P. Robinson, and my sisters, Mary E. Foster, Victoria Ward, Matilda Foster, A. (Watty) Jaeger and Lucy McWayne shall have the use, benefit, enjoyment and income thereof for and during the terms of their natural lives, and the survivors and survivor of them for his, her or their natural life or lives (equally while more than one); provided, however, that if my brother or any of my sisters shall die at any time leaving a child or children surviving him or her, then and in every such case and until the death of the last survivor of my brother and sisters such child and children (in equal shares while there shall be more than one) shall have the use, benefit, enjoyment and income of and from the said trust estate created under the Will of my late husband, which the parent of such child or children would take if living, and on the death of the last survivor of my said brother and sisters, I appoint that all the trust estate created under the Will of my late husband, of every description, nature and kind, then remaining, and wheresoever situate, and free and clear of the terms and provisions of the trust hereby created, and of the trust created under the Will of my late husband shall vest absolutely without conveyance or other act or

writing from or by the Trustees in all of the children then living of the said Mark P. Robinson, Mary E. Foster, Victoria Ward, Matilda Foster, A. (Watty) Jaeger and Lucy McWayne, said children taking per stirpes, the children if more than one of my brother or any sister taking in equal shares among themselves, and the children then living of any child then deceased of my brother or sisters taking per stirpes by right of representation, so that the children of my brother and sisters who shall be objects of this trust shall take in equal shares per stirpes and not per capita and the children (being objects of this trust) of any child of my brother or sisters having died in the lifetime of my brother or sisters or the survivor of them shall take equally between them the share which the parent would have taken had he or she survived the last survivor of my brother and sisters aforesaid. It being my will that all of the property of my late husband which under his said Will is subject to my power of appointment shall go to and vest in the same person and persons and otherwise be disposed of precisely as I have disposed of the trust estate created by me in this Will and covering the residue of my own private property."

We quote from the third and last codicil of Mrs. Allen's will: "Whereas, by the forty-eighth paragraph or article of my said Will, I give, devise and bequeath all of the rest, residue and remainder of my property, of every description, nature or kind and wherever situate, called my 'Trust Estate' unto Mark P. Robinson, Paul Muhlendorf and James E. Jaeger, and their successors in trust, called my 'Trustees' upon trust that my brother, Mark P. Robinson and my sisters Mary E. Foster, Victoria Ward, Mathilde Foster, A. (Watty) Jaeger and Lucy McWayne shall have the use, benefit, enjoyment and income thereof for and during the terms of their natural life, and the survivors and survivor of them for her, his or

their natural life or lives (equally while more than one), provided, however, that if my brother or any of my sisters shall die at any time leaving a child or children surviving him or her, then, and in every such case, and until the death of the last survivor of my brother and sisters, such child or children (in equal shares where there shall be more than one) shall have the use, benefit, enjoyment and income of and from my said trust estate, which his or her or their parent would have taken if living and on the death of the last survivor of my said brother and sisters, I give, devise and bequeath all the rest, residue and remainder of my property of every description, nature and kind, and wheresoever situate and free and clear of the terms and provisions of the trust absolutely and unconditionally vesting without conveyance or other act or writing from or by my trustees to all of the children then living of my said brother Mark P. Robinson and my said sisters Mary E. Foster, Victoria Ward, Mathilde Foster, A. (Watty) Jaeger and Lucy McWayne, said children taking *per stirpes*, the children if more than one of my brother or any sister taking in equal shares among themselves, and to the children then living of any child then deceased of my brother or sisters taking *per stirpes* by right of representation, so that the children of my brother and sisters who shall be the object of the trust shall take in equal shares *per stirpes* and not *per capita* and the children being objects of the trust of any child of my brother or sisters having died in the lifetime of my brother and sisters, or the survivor of them, shall take equally between them the share which the parent would have taken had she or he survived the last survivor of my brother and sisters aforesaid. Now I hereby confirm the said residuary devise and bequest, except only that on the death of the last survivor of my said brother and sisters, I give, devise and bequeath all the rest, residue and remainder of my

property of every description, nature and kind, and wheresoever situate and free and clear of the terms and provisions of the trust absolutely and unconditionally, vesting without conveyance or other act or writing from or by my said trustees to all of the children then living of my said brother Mark P. Robinson and my said sisters Mary E. Foster, Victoria Ward, Mathilde Foster, A. (Watty) Jaeger and Lucy McWayne, said children taking *per capita* equally among them (and not *per stirpes* as provided by my said Will) and to the children then living of any child then deceased of my brother or sisters who shall take *per stirpes* by right of representation the share only which their parent would have taken had he or she survived the last survivor of my brother and sisters aforesaid. AND I also appoint that on the death of the last survivor of my said brother and sisters all of the trust estate created under the will of my late husband of every description then remaining and free and clear of the terms and provisions of the trust created by my said will and of the trust created under the will of my late husband shall vest in all of the children then living of the said Mark P. Robinson Mary E. Foster Victoria Ward Mathilde Foster A. (Watty) Jaeger and Lucy McWayne said children taking *per capita* (and not *per stirpes* as provided by my said will) and the children then living of any child then deceased of my brother or sisters taking *per stirpes* by right of representation the share only which their parent would have taken had he or she survived the last survivor of my brother and sisters."

From these provisions in Mrs. Allen's will and codicil it is clear that she intended to merge the two estates to be administered by a single board of trustees and to make testamentary disposition of the property of both estates in the same manner and to the same persons.

Lucy McWayne, a sister of Mrs. Allen, and one of

the life tenants of her trust estate, is still living, hence the estate is still in the process of administration by the trustees pursuant to the requirements of Mrs. Allen's will.

The trust estate was the owner of the shares of capital stock of numerous dividend-paying local corporations and received from time to time stock dividends issued by these corporations on shares of stock held by the trust. The first of these dividends was 2690 shares issued by the Oahu Sugar Company, Limited, on August 15, 1916. Upon receiving the stock the trustees entered it in their books as "capital in stocks" and held and treated it as trust corpus. The accounts of the fiduciaries for the period from February 12, 1914, to and including August 31, 1915, were referred to the Audit Company of Hawaii as master, whose report was filed on December 1, 1915, and who criticized the accounts in many respects and recommended sundry surcharges, etc. The accounts of the second annual period, namely, September 1, 1915, to and including August 31, 1916, were referred to the same master. It was within the latter period that the stock dividend of the Oahu Sugar Company, Limited, was received by the trustees, although no mention was made of it in the accounts. In a report on the latter accounts, dated August 21, 1917, the master called attention to the receipt by the trustees of the stock dividend in August, 1916, and recommended that it be apportioned between capital and income pursuant to the rules adopted by this court in *Carter* v. *Crehore*, 12 Haw. 309, and *Evans* v. *Garvie*, 23 Haw. 651. Following the issuance of the stock dividend by the Oahu Sugar Company, Limited, numerous other like dividends were issued to the trustees, namely, Pioneer Mill Company, Limited, September 15, 1916, 1189 shares; Waialua Agricultural Company, Limited, May 18, 1917, 386 shares, December 20, 1935, 2509 shares; C. Brewer & Company, January 15, 1920, 155 shares, December 30, 1922, 621

shares; Honolulu Oil Corporation, Limited, December 30, 1922, 4648 shares; Mutual Telephone Company, February 2, 1925, 21 shares; Kohala Sugar Company, December 29, 1930, 11 shares common, 23 shares preferred; Hawaiian Agricultural Company, January 3, 1930, 106¼ shares; San Carlos Milling Company, October 31, 1916, 625 shares, July 10, 1920, 1250 shares, August 25, 1926, 1875 shares, April 18, 1928, 625 shares; Allen & Robinson, Limited, December 31, 1922, 1966-2/11 shares. Similarly as in the case of the original stock dividend received from the Oahu Sugar Company, Limited, all stock dividends subsequently received by the trustees have been and still are held and treated by the trustees as a part of the trust corpus.

It appears that subsequent to the report of the master dated August 21, 1917, the propriety of the action of the trustees in dealing with stock dividends was not again questioned in court until August 5, 1936, at which time the master appointed to audit the trustees' 1935 annual account recommended "the apportionment or allocation between life tenants and remaindermen of the stock and other extraordinary dividends received by the Trustees since the inception of the trust." An issue, therefore, which the master had raised in 1917 was again revived in 1936 and the trustees, evidently believing that an adjudication of the question should no longer be deferred, filed their bill for instructions in the circuit court in equity. After reciting the facts substantially as above, the petitioners asked "That an adjudication be made by this Honorable Court as to the matters set forth herein in respect of which said doubts and uncertainties have arisen, and a decree entered directing the petitioners in what manner, if any, they shall readjust their accounts and apportion the stock dividends issued to them as such Trustees since the death of said testatrix; * * * That in the event an apportionment is decreed, a complete accounting

for stock dividends and cash dividends be made, and in the event any of the life tenants or estates of deceased life tenants have been overpaid, the Trustees may charge the amount of such overpayments to the persons liable therefor and deduct the amount of such overpayment from any present or future payment under said will and codicils; and in the event any life tenant has been underpaid, that the payment of such sum as may be found due be decreed; and that the inventory of the Trustees, at the time of the entry of final decree herein, be approved."

Mark P. Robinson, a brother of Mrs. Allen and one of the life tenants named in her will, died April 3, 1915, and his two sons, namely, Mark A. Robinson and J. L. P. Robinson, succeeded him as life tenants. At the time of the institution of this suit the following named persons were the life beneficiaries, namely, Matilda A. Foster, Lucy H. McWayne, Iwalani A. Robinson, Mark A. Robinson, J. L. P. Robinson, Kulamanu Ward, Nellie E. Hustace, Mary Ward Wodehouse, Lucy K. Ward, Victoria Kathleen Ward and Lani Booth. In addition to the life beneficiaries there were many contingent remaindermen, both adults and minors. The suit involved the rights of those interested in the estates of deceased life beneficiaries. Many of the respondents, including Lucy McWayne, filed answers in which they urged that all stock dividends, as well as stock acquired by the trustees by the exercise of their right of purchase, became a part of the corpus of the estate and requested the court to so find and decree. Other respondents, including the representatives of the estate of Matilda Foster, who died on January 4, 1937, in their answers demanded that all stock dividends received by the trustees from the inception of the trust be apportioned between corpus and income in accordance with the rule prescribed by the supreme court of Hawaii in *Carter* v. *Crehore, supra.* Upon this and what may be termed sub-

sidiary issues the cause was tried in the circuit court, resulting in a decision in which the court referred to what it termed "the * * * application of the illogical rule of *Carter vs. Crehore* in the Garvie case in 1917" and denied "the right of any life tenant, including the representatives of deceased life tenants, to a present apportionment of any and all stock dividends heretofore received by the trustees." In its decision the court further found that the several life tenants and their successors in interest, from the inception of the trust down to January 1, 1935, had, with adequate means for information, constantly acquiesced in the action of the trustees in not apportioning stock dividends, that they had thereby waived all right to claim an apportionment of any stock dividends received prior to January 1, 1935, and are barred by laches and that the action of the trustees in not apportioning such dividends should be ratified and confirmed and that the trustees should be instructed and directed to keep and retain such stock as corpus of the trust subject to the right and power of the trustees to sell or dispose of the same in accordance with the provisions of the will. The court further found that the estate of Samuel C. Allen, deceased, merged with the estate of Bathsheba M. Allen, deceased, by operation of law and that the original life tenants and their successors in interest, since the date of the death of Bathsheba M. Allen, deceased, with the knowledge of the fact of said merger and the ruling of the court thereon made April 25, 1916, have constantly acquiesced in said ruling and are now barred from raising any claim that the two estates have not merged.

On December 14, 1937, the court entered its decree in conformity with its opinion theretofore rendered. From this decree Lucy K. Ward, Mae Jaeger Swift, George A. Marshall, executor of her last will, and Frank E. Thomp-

son, ancillary administrator of the estate of Matilda A. Foster, have perfected appeals to this court.

The issues, as presented to this court by the several appeals, may be summarized as follows: (1) Whether the rule of apportionment of corporate stock dividends between corpus and income, in accordance with what is known as the Pennsylvania rule, first established by the supreme court of the Territory of Hawaii in *Carter* v. *Crehore, supra,* is still the law in this jurisdiction; (2) are the life tenants, or any persons succeeding them, estopped by laches or waiver from now demanding apportionment of stock dividends heretofore received by the trustees of the above estate; and (3) whether or not the estate of Samuel Clesson Allen merged into and became a part of the estate of his wife, Bathsheba, at the time of the death of the latter.

Some of the appellees have attempted to inject into the case the doctrine of *res adjudicata* in support of the decree appealed from.

The questions at issue on appeal have been briefed and argued at great length by the appellants and by those appellees who have appeared in support of the decree of the lower court. That part of the decree which attempts to overrule and set aside the decision of this court in *Carter* v. *Crehore, supra,* and subsequent decisions confirming it, demands first consideration for, if the decree is a correct pronouncement of the law in that respect, then it follows that all stock dividends, when received by the trustees, became, by force of law, trust capital gains and as such were properly held by the trustees as corpus to be distributed as such to those to whom the trust property will ultimately go and the doctrine of laches, estoppel and waiver has no bearing. The decree makes no mention of the decison in *Carter* v. *Crehore, supra,* but it recites that "for the reasons set forth in the decision filed December

2, 1937, the action of the Trustees in not apportioning stock dividends between life tenants and remaindermen is hereby ratified, confirmed and approved, that the said Trustees are instructed and directed to keep and retain the stocks referred to in said bill * * * and any and all future stock dividends issued to the Trustees, in the corpus of the trust." In the decision referred to as the basis of the decree the trial judge indulged in caustic criticism of the opinions in *Carter* v. *Crehore, supra,* and *Evans* v. *Garvie, supra,* and gave notice of his refusal to be bound by them, thus directly ignoring the rule that it is the duty of the circuit courts to adhere to and be guided by the opinions of the supreme court of the Territory unless subsequently reversed by a superior appellate tribunal. In *The King* v. *Robertson,* 6 Haw. 718, 725, the court said: "The law of this country is found in our enacted statutes, and in the precedents established by decisions of our Supreme Court." (See also *Parke* v. *Parke,* 25 Haw. 397; *Guardianship of Anna T. K. Parker,* 14 Haw. 347; *Kapiolani Estate* v. *Atcherly,* 21 Haw. 441; *Valli* v. *United States,* 94 F. [2d] 687; 11 Cyc. 747.)

As indicated in the three leading local decisions, namely, *Carter* v. *Crehore, supra*; *Evans* v. *Garvie, supra*; and *Estate of Weber,* 34 Haw. 137, 146, dealing with extraordinary dividends, this court referred to the fact that there are two divergent American rules, one commonly designated as the "Pennsylvania rule" and the other the "Massachusetts rule." The State of Kentucky appears to have followed neither but has taken what might be called a middle course which is sanctioned by no courts outside of that jurisdiction. In the *Weber* case this court said: "While it is true in both *Carter* v. *Crehore, supra,* and *Evans* v. *Garvie, supra,* this court was dealing with an extraordinary stock dividend, it made clear however in these opinions that the court drew no distinction between

that type of dividend and extraordinary cash dividends so that in this jurisdiction the Pennsylvania rule of distribution has been approved and adopted. * * * Having reached the conclusion that the extraordinary cash dividend amounting to the net sum of $9450 paid to the trustees upon the Ewa Plantation stock held by them was a distribution of surplus earnings which accrued prior to the inception of the trust and the further conclusion that the so-called Pennsylvania rule has been adopted in this jurisdiction it necessarily follows that the dividend became, upon its receipt by the trustees, a part of the corpus of the estate unless the will of the testator provides a different method of allocation. The will in question was executed some years subsequent to the decisions of this court in *Carter* v. *Crehore, supra,* and *Evans* v. *Garvie, supra,* and it is presumed that the testator was cognizant of the rules of law therein announced at the time he executed the will. (*Long* v. *Rike,* 50 F. [2d] 124, 133, 69 C. J. 774.)"

In *Estate Thomas Cummins,* 16 Haw. 185, 192, decided in 1904, this court said: "The decision in *Carter* v. *Crehore,* in reference to stock dividends, is conclusive in the present case."

The appellees urged that this court now renounce the rule adopted by it first in the *Carter* v. *Crehore, supra,* decision, rendered February 27, 1900, and the subsequent decisions reaffirming adherence to the Pennsylvania rule and to now declare the Massachusetts rule to be the law in the Territory. This argument has its basis in the contention advanced by appellees that this court, at the time of the rendition of the *Carter* v. *Crehore, supra,* decision, was as a matter of law bound to follow the decision of the Supreme Court of the United States in *Gibbons* v. *Mahon,* 136 U. S. 549, decided May 19, 1890, and upon the further ground that if it be held that *Gibbons* v. *Mahon, supra,* was not controlling, then the Pennsyl-

vania rule should be repudiated because the Massachusetts rule is the superior and better of the two. It follows of course that if the local supreme court, when it rendered the opinion in the *Carter* v. *Crehore, supra,* case, was required as a matter of law to adhere to a decision of the Supreme Court of the United States rendered at a time when Hawaii was a Kingdom, and many years before it became a Territory of the United States, on a question not even involving a federal question but upon a matter of purely local concern, that the *Carter* v. *Crehore, supra,* decision and all subsequent pronouncements of this court adopting and approving the Pennsylvania rule of distribution must now be abandoned. Pursuant to what is known as "Newlands Resolution," adopted by Congress on July 7, 1898 (30 Stat. L. 750), the Hawaiian Islands and their dependencies were, on August 12, 1898, annexed "as a part of the territory of the United States and are subject to the * * * dominion thereof." Under the terms in the resolution Hawaii retained its former name of the "Republic of Hawaii" until June 14, 1900, when it was formally incorporated by an Act of Congress under the name of the "Territory of Hawaii." (See 31 Stat. L. 141; *Hawaii* v. *Mankichi,* 190 U. S. 197, 209, 242; *Rep. Haw.* v. *Edwards,* 11 Haw. 571.)

In the *Mankichi* case it was specifically pointed out that "the *laws* of the United States" were not extended over the Islands until the Organic Act was passed in April, 1900, when, so careful was Congress not to disturb the *status quo ante* any further than was necessary, it was provided, in section 5, that only the "laws of the United States * * * which are not locally inapplicable, shall have the same force and effect within the said Territory as elsewhere in the United States." It was within the intervening period between August 12, 1898, the date of annexation, and the Act of Congress of April 30, 1900,

that the opinion in the *Carter* v. *Crehore, supra,* case was rendered. Not until by Act of Congress of March 3, 1905, were appeals allowed from the supreme court of Hawaii to the Supreme Court of the United States on other than federal questions and not until that time did the Federal Supreme Court have appellate jurisdiction to entertain an appeal from this court in a proceeding involving the question at issue in *Carter* v. *Crehore, supra.*

In *Rubenstein* v. *Hackfeld & Co.,* 18 Haw. 126, this court said: "The supreme court of this Territory may now, notwithstanding the amendment of March 3, 1905, which permits appeals from this court to the federal supreme court in cases involving more than $5000, follow decisions previously rendered by this court, although contrary to decisions of that court, on other than federal questions. * * * But in our opinion the amendment did not have the effect of altering the law as previously established by judicial decisions any more than as established by statute or usage; nor did it have the effect of reversing the law as established by decisions properly made after the establishment of Territorial government but before the amendment." And again in *Lau Yin* v. *Pang Lum Mow,* 28 Haw. 476, it is said: "The rule of this jurisdiction allowing damages in such cases was adopted in the *See Yick Wai* case prior to the allowance of appeals from this court to a federal court upon other than federal questions and the allowance of such appeals could not operate to reverse that decision nor to require this court to overrule its former rulings and hold differently thereafter in accordance with the federal rule." And in *Ter.* v. *Wong Pui,* 29 Haw. 441, 452, the decision in *Rubenstein* v. *Hackfeld & Co., supra,* was reviewed, the court saying: "It has been definitely held, in *Rubenstein & Co.* v. *Hackfeld & Co.,* 18 Haw. 126, that this court may, notwithstanding the amendment to the Organic Act of March 3,

1905, which permitted appeals from this court to the Federal Supreme Court in cases involving more than $5000, follow decisions previously rendered by this court, although contrary to decisions of that court, on other than federal questions. The decision which we are following, strengthened as it is by the influence of our statutes, was rendered in 1867, long prior to annexation."

Following the enactment of the statute of 1905 extending the appellate jurisdiction of the Supreme Court of the United States, this court has repeatedly announced as a general rule of law that this court is controlled by the decision of the Federal Supreme Court. (See *Colburn* v. *U. S. F. & G. Co.*, 25 Haw. 536, 543; *Maki* v. *City and County*, 33 Haw. 167; *Thomson* v. *McGonagle*, 33 Haw. 594.) But what was said in these opinions did not purport to have application to purely local questions decided by the supreme court of Hawaii prior to the enactment of the statute in 1905, much less to a decision rendered before Hawaii became an organized territorial entity of the federal government. There is no general federal common law (*Erie R. Co.* v. *Tompkins*, 304 U. S. 64), and we are strongly inclined to the opinion that the Supreme Court of the United States would, even under its present plenary appellate power, refuse to disturb a decision of this court on a question of mere local concern unless manifest error appeared. Should this court elect to adopt one of two or more recognized rules of law involving no federal question (as it did in the *Carter* v. *Crehore, supra,* case) the Federal Supreme Court would, we think, refuse to disturb that action.

These conclusions are supported by the recent decision of the Supreme Court of the United States in *Waialua Co.* v. *Christian*, 305 U. S. 91, 106, 109, where the court said: *"Status of the Supreme Court of Hawaii.* The lower court [the United States circuit court of appeals for the ninth

circuit] acquired jurisdiction of the appeals under Judicial Code, § 128. When the Hawaiian Organic Act was passed in 1900, no provision was made for appeals from the territorial supreme court. In 1905, for matters involving more than $5,000, a direct appeal to this Court was provided. In 1911 review of the territorial supreme court was placed upon the same basis as review of the highest court of a State, with a continued right of review, generally, where the amount involved $5,000. Certiorari from this Court was provided by the Act of January 28, 1915, and for the first time review by circuit courts of appeals for cases involving $5,000 or over. In each of these successive enactments the Congress has recognized, to some degree, the autonomous position of the Supreme Court of the Territory. This recognition is natural. The territorial court has general appellate jurisdiction of cases involving the mores and statutes of an archipelago, the first known compilation of whose laws appeared in 1842. Isolated until the day of electrical communication and aerial transportation from continuous contact with other peoples, and inhabited by diverse stock of Oceanica, Asia, Europe and America, it developed, as an independent kingdom, a jurisprudence adapted to its needs. The constitution of Kamehameha III established a Supreme Court of the Kingdom in 1840 and defined its jurisdiction. The common law and the civil law were sources of information but not of authority. Until 1892, lacunae were filled by the judges. The laws developed were largely left in force by the Organic Act. These now include a declaratory statute on the source of Hawaiian law. This judicial tradition gives present substance to the rule of this Court that deference will be paid the understanding of territorial courts on matters of local concern. *Review of its Decisions.* While the determinations made by the territorial court upon the validity of instruments executed by incom-

petents, the interpretation of the contract of an incompetent, and the adjustments of equities concerning improvements after cancellation of a conveyance, partake of general law, as well as of local law, we see no reason for not applying the rule as to local matters to these circumstances. While the 34th section of the Judiciary Act is not applicable to territories, the arguments of policy in favor of having the state courts declare the law of the state are applicable to the question of whether or not territorial courts should declare the law of the territories with the least possible interference. It is true that under the appeal statute the lower court had complete power to reverse any ruling of the territorial court on law or fact; but we are of the opinion that this power should be exercised only in cases of manifest error. The differentiations, implicit and explicit, in the opinions of the Supreme Court of Hawaii, as to the rules of law applicable to the proceedings to set aside the deed of 1910 and those applicable to similar proceedings as to the lease of 1905 and the contract for maintenance of 1906, do not furnish occasion for reversal by the lower court. In so far as the decisions of the Supreme Court of Hawaii are in conformity with the Constitution and applicable statutes of the United States and are not manifestly erroneous in their statement or application of governing principles, they are to be accepted as stating the law of the Territory. Unless there is clear departure from ordinary legal principles, the preference of a federal court as to the correct rule of general or local law should not be imposed upon Hawaii." (See 53 Harv. L. Rev. 1048 [April, 1940].)

In the preparation of the opinion of this court in *Carter* v. *Crehore, supra,* p. 321, the author (Frear, C. J.) did not overlook *Gibbons* v. *Mahon, supra,* but on the contrary, after giving to it due weight and consideration, commented: "It may be remarked however that the

decision of the Supreme Court of the United States was written by Mr. Justice Gray who had previously held the same way as a member of the Supreme Judicial Court of Massachusetts, and that the cases *contra* in Kentucky, Tennessee, Maryland and the latest case in New York were all decided after and notwithstanding the decision by the Supreme Court of the United States and the text writers still adhere to the latter rule notwithstanding the weight of that high authority."

After a thorough investigation and consideration of the relative merits of the two rules, this court, with the utmost deliberation, adopted the Pennsylvania rule. As above indicated, that doctrine was expressly approved by this court on two subsequent occasions. It has been in force for the past forty years and until the decision of the circuit judge in the present case its soundness has never been attacked, nor even questioned, by any court in the Territory. The territorial legislature has many times convened since the rendition of the opinion in *Carter* v. *Crehore, supra,* but no legislative attempt has ever been made to change the rule approved in that case. It may be assumed that since the decision in *Carter* v. *Crehore, supra,* in the year 1900 and pursuant to the doctrine there announced stock dividends of great value have been distributed to countless individuals. It may further be assumed that after delivery to the original distributees many persons, relying upon the decisions of this court, in good faith and for value, have invested in that type of security. In other words, the *Carter* v. *Crehore, supra,* decision, affirmed as it was by the several subsequent opinions of this court, has ripened into a rule of property, and to depart from it at the present time would not only inflict a grave injustice upon property owners but would lead to the utmost confusion and chaos. As stated in 15 C. J. 947, "Where judicial decisions may fairly be

presumed to have entered into the business transactions of a country and to have been acted upon as a rule of contracts and property, it is the duty of the court, on the principle of stare decisis, to adhere to such decisions without regard to how it might be inclined to decide if the question were new. This rule obtains, although the court may be of the belief that such decisions are founded upon an erroneous principle and are not sound, for when parties have acted upon such decisions as settled law and rights have been vested thereunder, their inherent correctness or incorrectness in the abstract are of less importance than that the rule of property so established should be constant and invariable."

We do not conceive it to be the duty of courts to blindly adhere to the doctrine of *stare decisis*. The Supreme Court of the United States in *Gt. Northern Ry.* v. *Sunburst Co.,* 287 U. S. 358, by sustaining the decision of the supreme court of Montana in *Montana, etc. Co.* v. *Great Northern Ry. Co.,* 91 Mont. 194, 7 Pac. (2d) 919, authenticated a principle which enables courts of last resort to adapt case law to new conditions and new principles without depriving a litigant of the benefit of precedents finally deemed anachronistic and without making the court dependent upon the legislature for a needed correction. This highly practical view of the doctrine of adherence to precedent finds confirmation in an opinion by the court of appeals of Kentucky in *Payne* v. *City of Covington,* 276 Ky. 380, 390, 392, 123 S. W. (2d) 1045. There the court was required to determine whether it should follow an earlier opinion which it deemed obviously erroneous. The court quoted from *Liberty Nat. Bank & Trust Co.* v. *Loomis,* 275 Ky. 445, 121 S. W. (2d) 947, where it is said: "From an examination of the cases and authorities referred to it will be found that in no state of circumstances does the stare decisis rule require courts

to continue to adhere to a clearly demonstrated erroneous opinion, although they are much more reluctant to depart from the law as declared in a prior opinion when such declaration affects individual *property rights* and commercial transactions whereby such rights are acquired." Although the Kentucky court in *Payne* v. *City of Covington, supra,* did not hesitate to say that it was not bound by *stare decisis,* the court did realize that "property rights have been created in following our prior interpretations." To meet this difficulty the court relied on the common-sense view taken by the Montana court and upheld in the *Sunburst* case; it overruled the prior erroneous decision but announced it would not apply the decision in the instant case. The court's words here are significant, as are the citations we quote: "We conceive, however, it to be competent for a court, in overruling a prior adopted principle, to preserve in the overruling opinion all rights accrued under the prior declaration, the same as if they had been created or arose out of a former existing statute which was later repealed by the Legislature. That right was expressly declared by the Supreme Court of the United States in the case of Great Northern Railway Company v. Sunburst Oil & Refining Company, 287 U. S. 358, 53 S. Ct. 145, 77 L. Ed. 360, 85 A. L. R. 254; Gelpcke v. Dubuque, 1 Wall. 175, 17 L. Ed. 520; Haskett v. Maxey, 134 Ind. 182, 33 N. E. 358, 19 L. R. A. 379; Mason v. A. E. Nelson Cotton Company, 148 N. C. 492, 62 S. E. 625, 18 L. R. A., N. S., 1221, 128 Am. St. Rep. 635; Kelley v. Rhoads, 7 Wyo. 237, 51 P. 593, 39 L. R. A. 594, 75 Am. St. Rep. 904; Douglass v. County of Pike, 101 U. S. 677, 25 L. Ed. 968. The right was also approved by us in the case of Oliver Co. v. Louisville Realty Company, 156 Ky. 628, 161 S. W. 570, 51 L. R. A., N. S., 293, Ann. Cas. 1915C, 565. See, also, Illinois Cent. Railway Company v. Applegate's Adm'x, 268 Ky. 458, 105 S. W. (2d)

153 and the text in 7 R. C. L. page 1010, section 36, which is directly in point and conclusively establishes the authority of our appellate court to preserve prior rights created and emanating from overruled decisions. Therefore in overruling our prior opinions and in declaring our disapproval of such erroneous interpretations herein dealt with, we do so with the express reservation that all rights heretofore created and accrued in favor of all persons interested, in any manner whatsoever, shall be preserved and the principles of this opinion will not apply to any transaction begun or in the course of completion, or finished before this opinion becomes final. * * * As a consequence of the conclusions we have reached the opinions in the cases of City of Providence v. Providence Electric Light Co., supra, Overall v. City of Madisonville, 125 Ky. 684, 102 S. W. 278, 31 Ky. Law Rep. 278, 12 L. R. A., N. S., 433; Carter v. Krueger & Son, 175 Ky. 399, 194 S. W. 553, and all others following the interpretations therein made, are hereby expressly overruled; but with the reservation, supra, whereby the rights of all parties are preserved, and this opinion shall have a prospective effect only."

But unlike the Montana and Kentucky courts we are not confronted by a precedent that we are prepared to say is erroneous. Much has been said by the courts both for and against the Pennsylvania rule and the same may be said of the Massachusetts rule. One of the most recent pronouncements on the subject is to be found in Restatement, Trusts § 236, p. 701, where the Pennsylvania rule as applied by this court in *Carter* v. *Crehore, supra,* is expressly approved in the following language: "Extraordinary dividends declared during the period, whether in cash or in shares of the corporation or in other property, are income to the extent and only to the extent that they are declared out of earnings of the corporation

which accrued subsequent to the creation of the trust or the acquisition of the shares by the trustee." Were the question presented to us unembarrassed by local judicial precedent, we might or might not adopt the Pennsylvania rule of distribution, but our supreme court spoke when no rule of property was involved and has for many years maintained a consistent attitude of approval of the Pennsylvania rule.

For the reasons above stated we are unwilling to disturb the decision in *Carter* v. *Crehore, supra,* and its subsequent affirmances by this court adopting the doctrine that stock dividends representing earnings accumulated subsequent to the inception of the trust should be apportioned to the life tenants and such dividends as represented earnings accumulated prior to the inception of the trust should be apportioned to corpus. When, therefore, the trustees received the stock dividend in August, 1916, and other like dividends from time to time thereafter, and unless relieved of that obligation by the parties in interest, it became clearly their duty to apportion the stock in accordance with the formula prescribed in *Carter* v. *Crehore, supra,* namely, to distribute such part as represented earnings of the corporation which accumulated subsequent to the inception of the trust to the life tenants and to hold, as corpus, the part which represented earnings accumulated prior to the inception of the trust.

It is doubtless true, as stated by some of the appellees, that because of the lapse of time since the receipt of the stock dividends by the trustees the difficulties and expense of apportionment at this late day will be greatly enhanced. This fact, however, is hardly a persuasive reason for the denial to any of the parties of the rights to which they were entitled under the will of Mrs. Allen. As the stock dividends from time to time were received by the trustees, it was their obvious duty, under the law of this juris-

diction, to apportion and deliver to those of the life tenants, if any, who had not relinquished their rights thereto, the stock to which they were entitled, in obedience to the doctrine adopted by this court in *Carter* v. *Crehore, supra,* and *Evans* v. *Garvie, supra,* and much of the difficulty and cost of apportionment at this late date would have been obviated had not the trustees chosen to act in defiance of that doctrine.

The trustees claim that they retained the stock dividend as corpus because they were advised to do so by counsel. The domicile of the trustees, as well as the *situs* of the trust estate, is the Territory of Hawaii and the trustees were presumed to be familiar with the local laws. The advice of counsel cannot justify the pursuit by the trustees of a course clearly out of harmony with the decision of the courts of the Territory. (Perry, Trusts [7th ed.] § 927; 3 Bogert, Trusts § 541.)

The lower court in its decision said: "The only one of the original life tenants surviving, Lucy McWayne, is still to this day urging that stock dividends be retained as capital as has been done throughout the history of the trust. Iwalani Jaeger, sole life tenant representing the Jaeger branch of the family, also urges the continuance of the policy of keeping stock dividends as capital. The life tenants representing the original brother's share have all along approved *non*-apportionment and are *not* urging it now. Mary E. Foster, another original life tenant approved of non-apportionment up to her death, as also did Victoria Ward, another original life tenant. Matilda Foster, another life tenant originally approved of retention in the corpus, continued to acquiesce and gave notice of a change of policy in that respect only after the master's report of 1936 and shortly before her death in 1937, when the question arose as to the then pending 1935 accounts of the trustees. Mr. Geo. A. Marshall, appeared as the

executor of the Estate of Matilda Foster, and now claims that apportionment should be had. The executors of the will of Victoria Ward and representatives of the estates of other persons who from time to time during their lives had temporary life tenant interests are before the court, a small minority of whom favor apportionment and the balance are either indifferent or affirmatively urging *non*-apportionment. In view of this present dispute coming to light in 1936, re accounts of 1935, after a continuous history of non-apportionment originally approved of and later acquiesced in by the members of the class of life tenants up to 1936, the trustees have brought this bill for instructions and at the outset the hearing was restricted to the question of whether or not and how far if at all, that minority which now urges apportionment is barred by res judicata, waiver, estoppel, acquiescence or laches, to raise any question at this time re claim of apportionment of any of the respective stock dividends so listed as received by the trustees during the past twenty (20) years. This court is not impressed, because of the technical factors which are involved in the question, by the plea of res judicata. But the court does find as a fact from the evidence, that at the outset of this trust, and to and including the matters under investigation and discussion between the years 1914 and 1919, the then life tenants affirmatively waived any claim of right to litigate apportionment of stock dividends issued prior to January 1919, and then settled on a policy which justified the trustees then and thereafter in proceeding on the basis of non-apportionment during each year to and including all stock dividends received prior to January 1, 1935. The court further finds that with adequate means for information, if so desired, all life tenants and their representative-successors, together with the representatives of the estates of life tenants who died prior to January 1935, either

actually approved or acquiesced in such policy of non-apportionment or as privies to consenting life tenants are barred by laches to open any question relative to stock dividends *received prior to January 1935.*"

The trial judge, having repudiated the Pennsylvania rule of apportionment and having come to the conclusion that the Massachusetts rule of apportionment should become the law in this jurisdiction and having further found that all of the life tenants, past and present, have waived their rights to claim an apportionment and having invoked the doctrine of estoppel by laches, proceeded to ratify, confirm and approve the action of the trustees in not apportioning any of the stock dividends received prior to January 1, 1935, and instructed the trustees to retain all such stock, as well as future stock issued to them, as a part of the corpus of the trust, subject to the right and power in the trustees to sell or dispose of said stock and to change investments from time to time in accordance with the trust instrument or any provision of law.

Facts and circumstances were established at the trial sufficient, we think, to support the finding of the trial judge to the effect that Annie Jaeger, Mary Foster, Victoria Ward, Lucy McWayne and those who succeeded to the rights of Mark P. Robinson, all of whom were residents of the Territory, approved of the retention by the trustees of the stock dividends as a part of the trust estate. Lucy McWayne, the sole surviving original life tenant, by her answer expressly approved of that course. On an equity appeal findings of fact of the trial judge are entitled to much weight when the findings rest upon the credibility of the witnesses and the weight of all of the testimony and inferences to be drawn therefrom. (*Sumner* v. *Jones,* 22 Haw. 391; *Scott* v. *Pilipo,* 24 Haw. 277; *Jellings* v. *Garcia,* 29 Haw. 698; *Pinheiro* v. *Pinheiro,* 32 Haw. 659; *Hospital* v. *Wodehouse,* 33 Haw. 846.) But as we view

it neither the doctrine of waiver nor of estoppel has application. The action of the trustees in converting the stock dividends, otherwise distributable to the above named life tenants, into trust corpus was done in accordance with the wishes and pursuant to the directions of those parties. We are aware of no legal reason which prevented these life tenants from donating their respective rights in the stock dividends to the trust estate to be held and distributed at the termination of the trust as required by the trust documents.

A careful search of the record, however, has failed to bring to light any substantial evidence in support of the claim that Matilda Foster at any time approved or acquiesced in the retention as corpus by the trustees of any stock dividends to which she was entitled nor does the evidence sustain the defense of laches.

During the entire period of the trust, up to the date of her death, Matilda Foster resided in the State of California. The only evidence which might remotely connect her with knowledge of the receipt of any stock dividends by the trustees or her attitude toward the same was a conversation which Mr. Wodehouse testified took place between himself and Mrs. Foster at San Francisco, California, in the latter part of March, 1916, at which time Mr. Wodehouse says that Mrs. Foster expressed the wish to have stock dividends remain in the corpus of the estate. This conversation was some five months prior to receipt by the trustees of any stock dividends. The record shows that during the entire period from the inception of the trust to the death of Matilda Foster, Mr. Wodehouse was her personal agent in charge of her business affairs in Hawaii. He "handled her entire estate until her death." It further appears that following the receipt by the trustees of the first stock dividend in August, 1916, Mr. Wodehouse occasionally saw Mrs. Foster and a great deal of

correspondence passed between them in connection with the affairs of the estate but the subject of stock dividends was never again mentioned nor alluded to by either of them. Another peculiar circumstance is the fact that while Mrs. Foster received a copy of the trustees' accounts for the period beginning September 1, 1915, to and including August 31, 1916 (the period within which the trustees received a stock dividend of 2690 shares of Oahu Sugar Company, Limited), and the subsequent annual accounts of the trustees up to 1919, stock dividends received within those years were not listed nor referred to in any of these several accounts. After 1919 Mrs. Foster received mere summaries of the accounts which likewise contained no reference to stock dividends.

Matilda Foster was not informed of the receipt by the trustees of the first stock dividend in August, 1916, nor of any subsequent stock dividend of like nature. There was nothing to excite her suspicion nor any apparent reason for making an investigation. She was not required to exercise extraordinary diligence. Mrs. Foster undoubtedly entertained the utmost confidence in Mr. Wodehouse and relied upon him, as she had a right to do, to keep her reasonably informed of the affairs of the estate of her deceased sister. As heretofore indicated, the account of the executors (later the trustees) covering the period from February 12, 1914, to August 31, 1915, was filed and referred to the Audit Company of Hawaii, as master, and reported on by the latter on December 1, 1915. This report contained numerous recommendations of surcharges against the trustees, complained of the lack of proper books of account, the administration of the trust itself, and sundry recommendations adverse to the account, but there was no reference to stock dividends because none had been received up to the date of the filing of the account. On the advice of Mr. Wodehouse, Mrs. Foster

employed the local law firm of Frear, Prosser, Anderson and Marx to represent her at the hearing on the master's report. No final action was taken by the court on the account until 1919. Subsequently, in the latter part of 1916, the trustees filed their account for the period from September 1, 1915, to August 31, 1916. This account was likewise referred to the Audit Company of Hawaii as master. The master, on August 21, 1917, submitted its report, called attention to the Oahu Sugar Company stock dividend received by the trustees in 1916 and recommended its apportionment between corpus and income in accordance with the rule adopted in *Carter* v. *Crehore, supra.* There is nothing in the record to indicate that Matilda Foster received a copy of this report or was ever made aware of its contents. The two accounts came on for hearing before the circuit court at various times and were finally approved by a single order made June 30, 1919, *nunc pro tunc* as of January 31, 1919. The record, including the correspondence of Mr. Wodehouse with Matilda Foster, shows clearly that the authority of the firm of Frear, Prosser, Anderson and Marx to represent Mrs. Foster was limited to the first account, namely, the account covering the period from February 12, 1914, to August 31, 1915. Indeed this limitation of authority is made plainly to appear not only by correspondence but also by the interlineation in the order of June 30, 1919, in the handwriting of Judge Frear. There is no force in the contention of some of the appellees that Matilda Foster was a party to any proceedings in court in connection with the trustees' annual account from September 1, 1915, to August 31, 1916, or any subsequent account, or that she had knowledge of or was bound by the order of approval dated June 30, 1919, except to the extent that it purported to approve the account ending August 31, 1915. Matilda Foster was therefore entitled to have all

stock dividends received by the trustees during her life-time apportioned between corpus and income in accordance with the doctrine adopted in *Carter* v. *Crehore, supra,* and to receive from the trustees as her sole, individual property her proportionate share of said stock and since her death these rights have of course descended to her estate.

The action by the original life tenants who elected to donate their stock to the trust estate to be held as corpus could not have affected the rights of those who succeeded them, and who refused to make any such donation, to have their proper proportionate share in such stock dividends as may have been received by the trustees subsequent to the death of their respective predecessors in interest. "One cestui cannot consent for another to a breach of trust, nor can a majority of the cestuis either in interest or in number bind the minority by a request or consent that a breach of trust be performed. Where there are life and remaindermen cestuis, each can affect his own interest by consent, but not that of the other. In the absence of some doctrine of representation, it would seem clear that contingent or unborn cestuis cannot be bound by a consent of vested or living cestuis." 4 Bogert, Trusts and Trustees § 941, p. 2713. To illustrate, Lucy Ward upon the death of her mother, Victoria Ward, on April 11, 1935, became one of the income-takers and as such is entitled to her proportionate share of all stock dividends received subsequent to that date. Annie Jaeger, one of the original life tenants, died on November 29, 1921. Samuel Allen Jaeger, one of her children, thereupon became a life tenant. He, in turn, died May 23, 1927. His wife, Mae Jaeger Swift, is the executrix of his last will. There is no evidence that either Samuel Allen Jaeger or his widow, Mae Jaeger Swift, ever consented to the distribution of any of the stock dividends to corpus. Hence Mae Jaeger Swift,

as such executrix, is entitled to have such share of all stock dividends as were received by the trustees and which were distributable to Samuel Allen Jaeger in the intervening period between the death of his mother, Annie Jaeger, and his death.

It appears from the record that on November 20, 1936, the trustees received, by way of a bonus, 752 shares of the capital stock of the Hawaiian Pineapple Company, Limited, by virtue of the trust estate's ownership of 7528 shares of the capital stock of the Waialua Agricultural Company. It further appears that during the trial, by a stipulation of the parties approved by the court, the petition was amended by adding thereto paragraph VII-A showing that on June 8, 1937, Waialua Agricultural Company, Limited, had authorized the issuance of rights to subscribe to its shares at $20 par value to its stockholders of record on June 30, 1937, at the rate of one full share for every four shares of stock held; that the par value of such stock was in excess of $40 per share; that the trustees at the time, being the holders of 7528 shares of the capital stock of the company, would be entitled to subscribe for 1882 shares at par $20 per share; that on August 31, 1937, Hawaiian Pineapple Company, Limited, authorized the issuance of rights to subscribe to its shares of common stock without par value at $20 per share to its stockholders of record of October 20, 1937, at the rate of one full share for every share held and the trustees proposed to exercise such right and thus obtain 150 additional shares of the common stock of said company; that the Mutual Telephone Company had authorized the rights of issuance to subscribe to its shares of stock at par $10 to its stockholders of record August 15, 1937, at the rate of one share for every 3.30+ share held and that the trustees proposed to exercise all of the rights to subscribe to the aforesaid shares by which they would obtain 36

additional shares of the capital stock of said Mutual Telephone Company. In the stipulation it was agreed that an order might be made authorizing and directing the trustees to proceed with the purchase of the shares referred to therein and the court was requested to advise the trustees whether the stock acquired and to be acquired, in the manner referred to in said stipulation, should be apportioned between corpus and income or retained as corpus.

Paragraph 5 of the decree reads: "That the 752 shares of the capital stock of Hawaiian Pineapple Company, Limited, referred to in paragraph VII of said bill, distributed to said Trustees by virtue of their ownership of 7528 shares of the capital stock of Waialua Agricultural Company, Limited, on December 20, 1936, are hereby ordered distributed and distributable to the life tenants entitled thereto on December 20, 1936, and that all future dividends distributed to said Trustees under similar circumstances shall be treated as income; that the 150 shares of the capital stock of Hawaiian Pineapple Company, Limited, obtained by virtue of the exercise of rights to purchase shares of said stock, referred to in paragraph VII-A (2) of said amended bill, are ordered to be paid for out of the income of said estate, and the shares thus acquired are ordered distributed and distributable to the life tenants entitled thereto on December 20, 1936." It is clear that a stock dividend, though paid in the stock of another corporation owned by the declaring corporation, if it represents earnings of the latter, is a cash dividend. (24 A. L. R. 77; 72 A. L. R. 991; 83 A. L. R. 1267; 101 A. L. R. 1389.) That the life tenants were, as found by the lower court, entitled to have distributed to them the 752 shares of the capital stock of the Hawaiian Pineapple Company, Limited, we think cannot be questioned. The same may be said of the stock acquired by the trustees

through the exercise of the option to purchase stock referred to in paragraph VII-A of the amended bill, if paid for out of the earnings of the estate as required by the decree. The rule would be different if the transaction involved the sale by the trustees of the right to purchase. In the latter case the proceeds would, under the ruling in *Estate Thomas Cummins, supra,* become corpus.

Some of the respondents have invoked the plea of *res adjudicata* in an attempt to defeat the rights of appellants to participate in the stock dividends involved in this appeal. Counsel for Iwalani Jaeger Robinson asserts that in the proceedings of the petition of the trustees for approval of their accounts for the years 1914-1915 and 1915-1916 the question of whether the trustees' action in treating the 2690 shares of Oahu Sugar Company stock as being wholly capital was "actually litigated by all of the life tenants and was decided and judgment entered thereon," that the trustees' treatment of the stock was approved and the stock dividend was held to be wholly capital and that the parties are now bound by what counsel refers to as "the former judgment."

We can find nothing in the record to sustain the conclusion that the question of the disposition of stock dividends was ever litigated in the court below or that there has been any judgment or decree made or entered determining that question. No such adjudication appears in the decree of June 30, 1919, and upon the hearings which preceded it the life tenants were neither present nor represented other than in connection with the February 12, 1914, to August 31, 1915, account which, as already pointed out, did not involve stock dividends. It is "well settled that a fact or question in issue and litigated in a former action between parties is conclusively settled by the judgment therein and they are bound by the adjudication in another action between them." *Pilipo* v. *Scott,* 23

Haw. 26, 29. (*Makainai* v. *Lalakea*, 29 Haw. 482, 485; *Nakookoo* v. *Noholoa*, 19 Haw. 667; *Burns* v. *Afong*, 19 Haw. 486; *Haw. Com. & Sug. Co.* v. *Wailuku Sug. Co.*, 14 Haw. 50, 54; *Cromwell* v. *County of Sac*, 94 U. S. 351, 352, 356; *Southern Pacific Railr'd* v. *United States*, 168 U. S. 1; *Postal Telegraph Cable Co.* v. *Newport*, 247 U. S. 464, 467.)

But an order or decree approving an annual trust account does not become *res adjudicata* as to matters not actually adjudicated by the court nor is it binding upon parties not duly notified and who do not participate in the proceedings. (See *Estate of Baker*, 34 Haw. 263; *Estate of D. H. Davis*, 22 Haw. 436; *Estate of A. Enos*, 18 Haw. 542.)

The trial judge held that the doctrine of *res adjudicata* has no application in the case at bar and we agree with that conclusion.

Although not included within the matters upon which the trustees sought instructions, the doctrine of merger was injected into the case at the trial in the circuit court. The petitioners in their bill, and as a part of the narrative recital of the history of the cause, referred to the fact that Mr. Allen in his last will conferred upon his wife a power of appointment over his residuary estate and that this power was exercised by her in her last will and the codicils thereto; that the question of the merger of the estates of Mr. and Mrs. Allen was raised in the master's report upon the trustees' account for the period from February 12, 1914, to August 31, 1915; that on April 25, 1916, William L. Whitney, circuit judge, found and decreed that the two estates had merged. The trial court, however, took cognizance of the question and held that the estate of Samuel Clesson Allen merged with the estate of Bathsheba M. Allen by operation of law and that the original life tenants and their successors in interest, hav-

ing acquiesced in the order of April 25, 1916, are now barred from raising any claim that the two estates have not merged. The bill contained no averment that the stock dividends in question, or any part thereof so received by the trustees, were issued upon any stock originally owned by Mr. Allen or that his estate had any interest therein, nor does the bill contain any averment indicating that the petitioners entertain any bona fide doubt as to whether or not the two estates became legally merged, either by virtue of the decree of court, by operation of law, or otherwise.

Since a very early day equity has exercised jurisdiction over all matters relating to trust property and in the execution and administration of the trust and in all cases of doubt as to their rights and liabilities and what their conduct should be trustees are entitled to and should seek instruction and direction from the court so as to prevent them from committing an innocent breach of trust. (See *Bishop* v. *Pittman*, 33 Haw. 647, 653.) But the "fiduciary who is in doubt must set forth the * * * facts on which he grounds his right to relief." 44 Yale L. J. 1436. (See also *St. Paul's Church* v. *Attorney General*, 164 Mass. 188, 201, 41 N. E. 231.)

The Massachusetts case was before the court on a bill in equity to obtain instructions of the court in relation to a trust estate. It involved not only a trust fund but the question of title to a tract of trust realty. The court, after pointing out an absence of sufficient facts, said: "All that we can determine now is that enough does not appear to enable us to pass upon the question of title." For the reasons assigned the question of merger was not properly before the trial court for determination nor is it before us.

We think the course taken by us in the foregoing opinion sufficiently indicates our attitude upon the several

questions propounded to counsel preliminary to considera-
tion of the merits. It would not be inappropriate, how-
ever, to discuss briefly a matter of procedure raised by
the questions propounded, namely, to what extent may
the circuit judge, in a suit of this kind, consider and
determine disputed questions of fact.

Precedents indicate that ordinarily only those disputed
questions of fact may be considered and determined which
are germane to the questions of law presented and upon
which advice or instruction is sought by the trustees. In
other words only those disputed facts are considered and
determined which are so intermingled with the questions
of law involved that the determination of the former is
necessary for a decision upon the latter. Moreover we
are further persuaded that this rule may in a proper
case, in the discretion of the chancellor, give way to the
equally well-recognized principle that equity, having
jurisdiction of the subject matter, may retain jurisdiction
of the suit and afford complete relief as between the parties
thereto.

In a suit in equity brought by trustees to secure the
advice and instructions of the court of their appointment
upon the legality of apportionment of stock dividends as
between life tenants and remaindermen it unquestionably
would be perfectly legitimate to incorporate the additional
question, whether upon a certain state of facts, in the event
apportionment be ordered, the trustees could with safety
to themselves make distribution to life tenants of their
respective proportionate shares in such stock dividend.
And under such circumstances it would be competent for
the court in equity, as a basis of its determination, to
consider and determine the facts and predicate its in-
structions to the trustees upon its findings for or against
the life tenants.

The bill in the instant case, however, while alleging

doubt upon the legality of apportionment of stock dividends as between life tenants and remaindermen, expressly alleges as a fact the agreement and acquiescence by all of the life tenants to nonapportionment by the trustees. Nowhere in the bill is it alleged, nor does it appear therefrom, that the trustees entertain any doubt of the propriety, should apportionment be ordered, of making distribution to former or present life tenants. On the contrary, the bill of complaint negatives any doubt as far as the trustees are concerned as to the rights of life tenants in the event apportionment was ordered and concerns itself exclusively with the question of legality of apportionment. It was only upon answers being filed by certain respondent life tenants that it appeared that there were actual and subsisting disputes as between them on the one hand and the trustees, other life tenants and remaindermen on the other hand, as to whether such answering life tenants had renounced or relinquished their respective interests in such stock dividends. No exception was taken by the trustees to the disputed issues of fact thus precipitated into the case nor was any objection made by them or any of the other parties to the suit upon the trial to evidence adduced for and against these disputed questions of fact. It was not until the matter came before this court that the propriety of the consideration and determination of these disputed questions of fact came in question.

The circuit judge unquestionably had jurisdiction of the subject matter of the bill. If, in the consideration and determination of the disputed questions of fact, the circuit judge was in error, such error was not jurisdictional. Objection thereto was personal to the parties affected.

The cause is remanded to the court below with directions to modify the decree appealed from in accordance

with the foregoing views and for such further proceedings, in harmony with this opinion, as may be appropriate.

*Thompson, Wood & Russell* filed brief on behalf of George A. Marshall, executor, and for the ancillary administrator but did not argue.

*M. K. Ashford* (*W. H. Heen* with her on the briefs) for Lucy K. Ward.

*I. M. Stainback* (*Stainback & Massee* on the briefs) for Mae Jaeger Swift.

*A. Perry* (also on the briefs) for certain of the appellees.

*C. A. Gregory* (*Smith, Wild, Beebe & Cades* on the briefs) for certain of the appellees and as guardian ad litem in person.

*J. G. Anthony* (*Robertson, Castle & Anthony* on the briefs) for the trustees.

*Stanley, Vitousek, Pratt & Winn* filed briefs for Marion Jaeger Worthington but did not argue.

*Anderson, Marx, Wrenn & Jenks* for W. W. Chamberlain, trustee of the estate of Annie Jaeger, filed no brief and presented no argument.